ORIGINAL

cc:lek

James H. Fosbinder #7070
IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY
1883 Mill Street
Wailuku, Hawaii  96793
Telephone:  (808)242-4956
Facsimile: (808)249-0668
Email: jfosbinder@iff-law.com

Attorneys for Plaintiffs
PHARAOH O. MARTIN and KAREN R. NORTON

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 24 2011

at 12 o'clock and 10 min. P.M.
SUE BEITIA, CLERK

## UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAII

| | |
|---|---|
| PHARAOH ORLANDO MARTIN and KAREN RENEE NORTON, | Civil No. CV11 00118 LEK BMK |
| Plaintiffs, | COMPLAINT; EXHIBITS "1 TO "6"; DEMAND FOR JURY TRIAL; SUMMONS |
| v. | |
| GMAC MORTGAGE CORPORATION; GMAC MORTGAGE LLC; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS; and DOES 1 through 20 inclusive, | |
| Defendants. | |

### COMPLAINT

Plaintiffs PHARAOH ORLANDO MARTIN and KAREN RENEE NORTON (Plaintiffs, or PHARAOH and KAREN) by and through their attorney, JAMES H. FOSBINDER, of IVEY, FOSBINDER, FOSBINDER LLLC, a limited liability law company, bring the following Complaint and allege and aver as follows:

### JURISDICTION AND VENUE

1

1.     Jurisdiction arises under 28 U.S.C. § 1331 (Federal Question Jurisdiction); Sherman Anti-Trust Act, 15 U.S.C. § 2 and Clayton Anti-Trust Act, 15 U.S.C. § 15 et seq.

2.     Jurisdiction also arises under 28 U.S.C. § 1332 (Diversity Jurisdiction).

3.     This Court has supplemental jurisdiction over this action under 28 U.S.C. § 1367(a) because state law claims are so related to the federal claims that they form part of the same case or controversy. These claims all arise out of the same controversy and sequence of events. This Court has jurisdiction over state claims asserted under Hawaii Revised Statutes (hereinafter "HRS") by virtue of pendent jurisdiction.

4.     Venue is proper in the United States District Court for the District of Hawaii, pursuant to 28 U.S.C. § 1391, in that Defendants systematically conduct and transact substantial business in this State and District as licensed banks and corporations organized and/or operating in the State of Hawaii, the causes of action occurred in this District, and Plaintiff resides in this District.

<u>PARTIES</u>

5.     Plaintiffs PHARAOH and KAREN are and were at all times relevant herein over the age of eighteen and were residents of the County of Maui, State of Hawaii, and are consumers in regard to credit transactions.

6.   Defendant GMAC MORTGAGE CORPORATION (GMAC) is a corporation organized under the laws of the State of Pennsylvania, and which conducts business in the State of Hawaii.

7.   Plaintiffs PHARAOH and KAREN are informed and believe and on that basis allege that Defendant GMAC MORTGAGE LLC (GMAC-LLC) is a limited liability company organized under the laws of the State of Delaware and which conducts business in the State of Hawaii.

8.   Defendant Mortgage Electronic Registration Systems, Inc. (MERS), is a New York corporation and a wholly owned subsidiary of MERSCORP, Inc., a Delaware corporation whose corporate headquarters is in Virginia. Shareholders and MERS membership include a majority of corporations engaged in the mortgage industry in the United States.[1] MERS provides mortgage loan related services in all fifty states, and is "nominee" for

---

[1] MERSCORP, INC.'s shareholders include ABN-AMRO Mortgage Group, Inc.; American Land Title Association; CCO Mortgage Corporation; Chase Home Mortgage Corporate of the Southeast; CitiMortgage, Inc.; Commercial Mortgage Securities Association; Corinthian Mortgage Corporation; Countrywide Home Loans, Inc.; EverHome Mortgage Company; Fannie Mae; First American Title Insurance Corporation; Freddie Mac; GE Mortgage Services, LLC; GMAC Residential Funding Corporation; Guaranty Bank; HSBC Finance Corporation; Merrill Lynch Credit Corporation; MGIC Investor Services Corporation; Mortgage Bankers Association; Nationwide Advantage Mortgage Company; PMI Mortgage Insurance Company; Stewart Title Guaranty Company; SunTrust Mortgage, Inc.; United Guaranty Corporation; Washington Mutual Bank; Wells Fargo Bank, N.A., and WMC Mortgage Corporation.

Defendant GMAC pursuant to two mortgages secured by real property located at 609 Loulu Way, Makawao, Hawaii, TMK (2) 2-4-029-079-0000 (the Subject Property): a first mortgage dated December 19, 2005, and recorded in the State of Hawaii Bureau of Conveyances, Document No. 2005-265228 (the First Mortgage); and a second mortgage dated March 15, 2006, and recorded in the State of Hawaii Bureau of Conveyances, Document No. 2006-092705 (the Second Mortgage). Copies of the First and Second Mortgages are attached hereto as *Exhibits 1 and 2* respectively, and incorporated herein by reference.

9.   Defendants GMAC, MERS, and DOES 1-20 operate mortgage originating and mortgage servicing businesses that solicit, cater, and service millions of home loans annually. Based on understanding and belief, certain Defendants and their agents, officers, affiliates and/or employees have operated as a common enterprise while engaging in the unlawful acts and practices alleged below. Because Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Additionally, because any acts or omissions were performed by those Defendants' agents, officers, and/or employees within the scope of their actual or apparent authority, which were known and/or should have been

known to those Defendants or their predecessors in interest, are imputed to those Defendants.

10.   DOES Defendants 1-20, inclusive, are various individuals, partnerships, associations, corporations, and other entities claiming any legal right, title, estate, lien, or interest in the Subject Property, as described adverse to Plaintiffs' interests.  Plaintiffs PHARAOH and KAREN will make a good faith effort to determine the true names and identities of these parties. Plaintiffs reserve the right to amend this Complaint to add such parties as their true identities and capacities are ascertained through discovery or otherwise.

## INTRODUCTION

11.   Historically, loans were mainly made by lenders within the local marketplace.  Banks made money by charging more interest than they paid to depositors.  If the bank made bad loans, the bank lost income.  For this reason, banks made serious investigation of the borrower's ability to pay back the loan. When a bank approved a loan application, it meant something; it meant it was likely the borrower *could* and would repay the loan. Loans often remained with the original lender for the lifetime of the loan.

12.   Although speculation in real estate existed, profits were generally made from appreciation of land values over time largely because of the checks and balances of the loan

origination process itself and also due to the demands of the statutory recordation requirements. The only way to aggressively buy and sell an interest in mortgage-related assets on a frequent basis was to buy stock in corporations set up to invest/speculate in real estate. Most important, it was almost impossible to invest in a speculative way in single-family homes. You could invest in the stocks of companies that built single family homes, or in the stock of lenders that financed home loans, but that was about it. Day trading in securities based on real property did not exist, and the securitization of residential mortgages was non-existent.

13. Land records such as deeds, mortgages, and assignments of mortgage were recorded in the Hawaii Bureau of Conveyances and/or with the Assistant Registrar of the Land Court. If a mortgage was assigned to a new mortgagee, that assignment was recorded and, therefore, was publicly available.

14. Recordation of paper, however, was not fast or cheap enough for the mortgage industry. Seeking a means of capitalizing on the huge profits to be made from mortgage securitization, the largest banks in the United States got together to form Merscorp, Inc., in or about 1996. Mortgage Electronic Registration System, Inc., whose sole shareholder is Merscorp (Collectively, the entities are referred to herein as "MERS"), was then allegedly created to streamline the mortgage

banking industry by using "electronic commerce" to eliminate
paper – which allowed the mortgage industry to circumvent the
state's recordation statutes and bundle mortgages into packages
they could then sell to investors.

15.   MERS' mission was to register every mortgage loan in
the United States[2] to facilitate trading in mortgage-backed
securities.   The MERS monopoly now includes more than 90 percent
(by gross lending) of the mortgage lenders and servicers active
in the United States.   Since its creation, MERS has undermined
and eviscerated the long-standing principles of real property
law and the state's recording statutes and the borrowers and the
public at large are paying an enormous price for the profits
reaped by this scheme, not to mention robbing the states of
their transfer and excise tax revenues.

16.   The way that MERS circumvents the state's recording
statutes is as follows:   In mortgages, MERS is named as
"nominee" for the lender (arguably a form of agency).   It is
often the entity recorded in the state recordation office as
being the original mortgagee.   MERS claims that this
"inoculates" the mortgage against future assignments because
MERS remains the nominal mortgagee "no matter how many times

---

[2] *About MERS*, Merscorp, Inc. www.mersinc.org/about/index.aspx.
Retrieved 11/8/2010.

servicing is traded."[3]  Tracking subsequent assignments of

mortgage happens strictly within the MERS databases.

> "Because MERS remains the mortgagee of record in the public
> land records throughout the life of the loan; it eliminates
> the need to record later assignments in the public land
> records…. MERS does not create electronic assignments; it
> eliminates the need for subsequent assignments altogether.
> After MERS becomes Mortgagee, there are no more
> assignments, except on the rare occasion when a Member
> wants an assignment from MERS."[4]

17.  A typical clause naming MERS in a mortgage is as

follows:  "MERS" is Mortgage Electronic Registration Systems,

Inc. MERS is a separate corporation that is acting solely as

nominee for Lender and Lender's successors and assigns.  MERS is

the mortgagee under this Security Instrument.

18.  Recent legal challenges have questioned the legal

inconsistencies in MERS' roles: as "nominee" (arguably "agent")

and also as "mortgagee," i.e., the owner of the real property

right to foreclose.  An entity can not be both an agent and a

principal with respect to the same right.  Further, upon

information and belief, the State of Hawaii has never authorized

MERS to make changes to the state's real property recording

statutes.  Plaintiffs argue that MERS, purporting to act "solely

as nominee," furthers foreclosures by (among other acts)

---

[3] Id.

[4] R.K. Arnold, "Yes, There is Life on MERS®" Real Estate Law, ABA
Network, Spring 1998, Vol. 2, No. 1.
http://www.abanet.org/genpractice/magazine/1998/spring-
bos/arnold.html.

transferring promissory notes and appointing assignees under assignments of mortgage in a system that is hidden from public and governmental scrutiny and oversight.  For example, it is nearly impossible for any but the savviest researcher to discover the trail of assignments leading to a borrower's current note holder and mortgagee.  In many cases, the actual mortgage and promissory note have been destroyed or are now missing, which raises questions of who owns the mortgage and note and how (and who) enforces these agreements.  Missing documents leaves the parties to the contract unidentifiable, which also affects contract reformation – "loan modification."

19.  Hand-in-hand with the largest lending institutions' joint creation of MERS, the mortgage industry introduced new "products" such as "non-documentation loans" (aka "no doc loans" and adjustable-rate mortgages, known as "ARMS," and the most egregious of all, negative amortization loans (In other words, after 10 years of making your mortgage payments, you owe more than you borrowed originally).  Mortgage lenders acting in concert relaxed lending standards, making lower-income individuals eligible for loans. This, in turn, drove up property "values."  Part of this scheme included accepting "appraisals" that purported to document the new, higher values.  The result was that hundreds of thousands of applications for financing

were approved nationwide, most of which would have otherwise been declined under traditional lending standards.

20.   Behind the veil of Merscorp and MERS, the big lending institutions knew they were issuing "bad paper" – in many cases, lenders told borrowers at the eleventh hour that the loan terms they had been promised were no longer available, and lenders swapped out grossly negligent loan documents at the eve of closing.  The mortgage giants intended to get in and get out of the mortgage-backed securities marketplace before the borrowers defaulted on a loan they could never afford – and should never have been coerced into in the first place. The result is that the borrowers and the investors in mortgage-backed securities were both victims of this mass fraud perpetuated by MERS and its members.

21.   MERS, again, was created primarily to facilitate the securitization of mortgages, which, in simple terms, involves three steps: First, a mortgage is sold by its originating lender; second, the mortgages are "bundled" or "pooled"; third, the pool of mortgages is securitized and divided into "tranches" (broken up into groups indicative of the risk to investors, also called "derivatives").

22.   The third step – securitization – of a pool of mortgages is complicated, and the process is (or should be) governed by the laws of the jurisdiction in which the

securitization takes place. The early mortgage securitization contracts were designed to satisfy State and Federal laws, such as the Uniform Commercial Code (governing "secured" transactions), and state trust law (packaged loans were often put into trusts that allegedly offered protections that appealed to investors).

23.   Securitizing a mortgage loan involves several steps, which must be done precisely in order to be effective: The promissory note had to be endorsed by the originator and other parties before it could be placed into the trust, and the mortgage had to be assigned to the Note Holder. Generally, this process must be completed within 90 days of a trust's "closing." Most mortgage-backed securities are bonds issued by U.S. government-sponsored Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), but mortgage-backed securities can also be issued by private companies.

24.   Additionally, with the securitization of mortgages, investors could successfully wager on the failure of mortgages. When interest rates rose, these mortgage-backed securities (often in the form of bonds) fell in value; conversely, when interest rates fell, the value of the bond rose.

25.   MERS, its members, and others with inside information could win big. If an investor was privy to information that a

good number of mortgages in a pool would fail or that the mortgages exceeded the value of the collateral, they could bet these mortgage-backed securities would be worth less in the future.  Add to this the leverage available through the options, or futures markets, and an institution could gamble on millions of dollars of mortgages with very little investment.  These highly leveraged "derivatives" enabled investors to capitalize on mortgages being worth more, or worth less, in the short term.

26.  Hence, a banking institution could "insure" itself against losses in the underlying mortgages by betting that a number of the mortgages it underwrote, would fail. Talk about inside information.

27.  Making the deal sweeter for the banks/originators of the loans, the mortgages had already been sold via MERS, most likely into an investment pool where the actual investors also were sold bonds grossly inflated in value and quality by the mortgage industry.  The scheme to dupe the investors was also deceptively simple: Through placing vastly undercapitalized so-called "insurance" on the lowest-rated loans (Triple C), the players magically turned those junk loans into Triple A-rated bonds, turning millions into billions worth of profit when they were sold.

28.  In addition, most institutions holding subprime mortgages required mortgage insurance on the loans, sometimes

insuring against mortgage failure 30-times over. They stood to gain more if a borrower defaulted than if he performed fully; hence, there was not much of an incentive to modify or refinance loans for borrowers who had fallen on tough times – despite federal government programs paying lending institutions to do that very thing.

29.     For those loans that were insured against default, it appears these loans were paid off by the federal bailout of insurance giant AIG and others. If the foreclosing entity has already been paid off, then it no longer has an enforceable interest in the loan.

30.     MERS controls the operation of the mortgage industry and such control has harmed the borrowers, including the Plaintiffs herein. On its homepage, it touts: "MERS is an innovative process that simplifies the way mortgage ownership and servicing rights are originated, sold and tracked. Created by the real estate finance industry, MERS eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans."[5]

31.     MERS Membership Rules and By-Laws govern its members' loan servicing and foreclosure practices. Members agree to be "bound" by the provisions of the Rules and Bylaws, including MERS' rules governing foreclosure practices.[6]

32.     MERS also intentionally withheld the identity of "investors" (the purported holders of the promissory notes secured by the mortgages). Because of the recent political and

---

[5] "Welcome to MERS!" http://mersinc.com.
[6] Merscorp, Inc., "Rules of Membership," http://www.mersinc.org/Foreclosures/index.aspx; also see, MERS' "Legal Primer" regarding foreclosure.

legal pressure, MERS recently sent out a press release announcing that it would reveal the investor's name and contact information information, but only if the investor(s) agreed to the disclosure. Because it was a MERS' policy, all members had to comply.

33.  The MERS monopoly has resulted in the creation of a previously unimaginable industry: one established to create false documents. One such firm has made national news by offering a menu of services, which has been reported by the national media to include "creating – that is, conjuring from thin air – various documents that the trust owning the loan should already have on hand." The firm offers creation of a "collateral file," i.e., all the documents needed to establish ownership of a real estate loan. "Equipped with a collateral file, you could likely persuade a court that you were entitled to foreclose on a house even if you had never owned the loan."[7]

34.  Attorneys general from all 50 states are investigating the poor record keeping by MERS, banks, and the servicers (companies that collect mortgage payments). The Federal Reserve is investigating whether mortgage companies have cut corners in the foreclosure process, using "robo-signers" to sign thousands

---

[7] Yves Smith, *How the Banks Put the Economy Underwater*, New York Times (October 30, 2010), http://www.nytimes.com/2010/10/31/opinion/31smith.html?_r=1&sq=m

of mortgage assignments and foreclosure documents without having made the legal investigation required to execute such documents.

35.  Many anti-trust claims involve esoteric mathematical analysis of claimed price manipulation by companies controlling as little as 10 percent of an industry in relatively small area. Complex math is not necessary in this case. Under any test, MERS and its shareholders control the mortgage industry, the foreclosure assistance industry, and the digital identification of real property.

36.  Under any test, MERS and its shareholders control the mortgage industry, the foreclosure assistance industry, and the digital identification of real property. As to its own members claiming that MERS is a monopoly, Ocwen Loan Servicing LLC sued MERS, claiming, "Without access to MERS, Ocwen cannot compete because it will be denied access to a business element necessary for effective competition." See, *Ocwen Loan Servicing LLC v. Mortgage Electronic Registration Systems, Inc.,* Civ. 1:08cv824, (U.S. Dist. Ct., E.D. Va., filed August 8, 2008).

37.  What MERS and the mortgage industry did was to turn an orderly system of investment-based risk into Monte Carlo, Las Vegas and internet gambling all rolled into one. As a result the real property markets were destabilized, banks made income on

ortgage securitization&st=cse&scp=1&pagewanted=all (last accessed 11/8/2010).

fees for both betting on and betting against homeowners, and millions of families will lose their homes to foreclosure. MERS and its shareholders were well aware that they had created a Ponzi scheme - but like all "successful" such schemes, if you get in and out early, they make darn fine investments.

38.  What justice demands today is that the borrowers -- and the investors -- in the mortgages have an opportunity to work through this mess of the securitization of mortgages and come to a resolution that is best for both parties, and, the public at large. Plaintiffs request the opportunity to work with the actual investors of the mortgages, which would be a question of fact that can only be resolved by an evidentiary hearing into who is the actual Note Holder, how much is owed and to whom, and whether any third-party payments have been made on Plaintiffs' behalf, by insurance or otherwise.

<u>STATEMENT OF FACTS RELEVANT TO ALL CLAIMS</u>

39.  The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

40.  On or about December 19, 2005, Plaintiffs PHAROAH and KAREN executed the Mortgage in favor of GMAC as lender, secured by the Subject Property.  The Mortgage indicated that MERS was the mortgagee for the security instrument, and was acting "solely as nominee for Lender." *See Exhibit A.*

41.   Plaintiffs PHAROAH and KAREN also executed a
promissory note (First Note) in the principal amount of $548,000
on or about December 19, 2005.  At the time of the closing, the
Note was secured by the Mortgage on the Subject Property.  The
First Note carried a fixed rate of 6.25% for five years,
followed by a rated annually adjusted to the LIBOR index for the
remainder of the loan term.

42.   On or about December 19, 2005, Plaintiffs PHAROAH and
KAREN also executed an open-ended mortgage in favor of GMAC as
lender, also known as a line of credit (the LOC).  The LOC
indicated that MERS was the mortgagee for the security
instrument, and was acting "solely as nominee for Lender."   The
LOC carried an initial interest rate of 6% for five years, after
which the rate became adjustable.  A copy of the LOC is attached
hereto as Exhibit C, and incorporated herein by reference.

43.   At the time that Plaintiffs PHAROAH and KAREN obtained
their loans and executed the First Mortgage and the LOC, they
were assured by GMAC's representatives that they would be able
to refinance their mortgages and obtain fixed-rate loans well
before the end of five years and the interest rates became
adjustable.

44.   On or about March 15, 2006, Plaintiffs PHAROAH and
KAREN sought and were granted a refinancing of the LOC into the
Second Mortgage by GMAC, even though it was GMAC's policy at the

time not to permit refinancing within 6 months of a loan origination. The promissory note for the Second Mortgage (the Second Note) bore a fixed interest rate of 8.395%.

45. Plaintiffs PHAROAH and KAREN were induced to believe GMAC would look out for their best interests and placed their trust and confidence in GMAC to qualify them for the loans and provide them with the most favorable loan terms to which they were entitled.

46. Plaintiffs followed all of GMAC's instructions and submitted all documentation requested by GMAC. Based upon the information provided by GMAC and its employees and/or agents, Plaintiffs PHAROAH and KAREN believed that GMAC had a fiduciary obligation to them to protect their interests and maintain their privacy.

47. GMAC required an appraisal of Plaintiffs' property as part of the loan application process which Plaintiffs paid for in the closing costs. Plaintiffs PHAROAH and KAREN relied upon the accuracy of GMAC's appraisal in making their decision to pledge the Subject Property. A copy of the appraisal, made by Bradley Pitts, of PROPERTY ANALYSTS HAWAII, and dated November 16, 2005, is attached hereto as *Exhibit 4*, and incorporated herein by reference.

48. The appraisal described the Subject Property in detail, included a floor plan, and noted that the Subject

Property had a cesspool rather than a sanitary sewer or septic tank, and identified a 379 square-foot "ohana" (or, secondary dwelling) with a kitchenette, which is in addition to the kitchen in the main dwelling. *Exhibit 4.*

49.   Plaintiffs PHAROAH and KAREN upon information and belief and on that basis allege that GMAC was aware of the physical condition of the Subject Property, including the physical layout and cesspool system, when GMAC made its decision to approve Plaintiffs PHAROAH and KAREN for the First Mortgage, the LOC, and the Second Mortgage on the Subject Property.

50.   In December 2007, Plaintiffs PHAROAH and KAREN attempted to refinance the First Mortgage with GMAC, but because of the uncertainty in the market conditions and relying upon the advice of GMAC's representative, Patricia Ward, decided to wait for conditions to improve.

51.   In February 2008, sensing that market conditions were continuing to deteriorate, Plaintiffs decided to and did apply to refinance the First Mortgage.

52.   GMAC notified Plaintiffs PHAROAH and KAREN that it would not refinance the First Mortgage because the Subject Property was not in compliance with the large capacity cesspool regulations (LCCR) promulgated by the U.S. Environmental Protection Agency (EPA), as set forth at 40 C.F.R. parts 144-147.

53.   Plaintiffs PHAROAH and KAREN consulted a professional engineering firm, and obtained an engineering report on the wastewater system on the Subject Property. The engineering report confirmed that the Subject Property was not in compliance with the EPA LCCR.

54.   Plaintiffs PHAROAH and KAREN subsequently learned that the EPA promulgated the LCCR in 1999, that the LCCR prohibited building new large capacity cesspools as of April 5, 2000, and that owners of properties with such cesspools were required to upgrade them as of April 5, 2005, more than seven months before Plaintiffs PHAROAH and KAREN purchased the Subject Property.

55.   Plaintiffs are further informed and believe and on that basis allege that Defendant GMAC knew that the Subject Property was subject to, and not in compliance with the EPA LCCR at the time it agreed to extend loans to Plaintiffs PHAROAH and KAREN secured by the First Mortgage, the LOC, and the Second Mortgage.

56.   Defendant GMAC did not disclose to Plaintiffs PHAROAH and KAREN that the Subject Property was subject to and not in compliance with the EPA LCCR when they applied for and obtained the First Mortgage, the LOC, or the Second Mortgage.

57.   Further, Defendant GMAC did not disclose to Plaintiffs PHAROAH and KAREN that there was any policy or procedure of GMAC that would preclude it from extending a loan on the Subject

Property because it was subject to and not in compliance with the EPA LCCR when they applied for and obtained the First Mortgage, the LOC, or the Second Mortgage.

58. In or about March 2009, Plaintiffs PHAROAH and KAREN, after learning of the federal government's Home Affordable Modification Program (HAMP), again contacted GMAC about modifying their loan.

59. Plaintiffs PHAROAH and KAREN received a call from DAVID STARLING, a loan representative of GMAC, who told Plaintiffs could modify their loans, reducing the principal on the Second Mortgage and consolidating it with their First Mortgage. He also stated the closing costs could be absorbed into the modified mortgage, and PHAROAH and KAREN would not have any out-of-pocket expense at the inception of the modified mortgage.

60. Based upon DAVID STARLING'S representations, Plaintiffs PHAROAH and KAREN submitted an application to GMAC representatives RHONDA PINTEK and DAINA SAMUEL in Hartford, Connecticut.

61. After several months of submitting and resubmitting documents to GMAC representatives PINTEK and SAMUEL, GMAC offered a modification in which the interest rate would be fixed and the principal on the mortgages would be slightly reduced, but which would require Plaintiffs PHAROAH and KAREN to pay

approximately $18,000 in closing costs out of pocket, contrary to what had been represented to them by DAVID STARLING, wiping out any benefit they would obtain from a modification, and increasing rather than decreasing their monthly payments.

62.  When Plaintiffs PHAROAH and KAREN questioned why they would have to pay closing costs and their payments would go up, in contravention to what had been represented to them, GMAC ceased responding.  Plaintiffs PHAROAH and KAREN were unable to continue or complete the modification process.

63.  Plaintiffs PHAROAH and KAREN contacted several other lenders about obtaining refinancing, but were unable to obtain any relief, either apparently because of their debt to equity ratio or because of the Subject Property's non-compliance with the EPA LCCR.

64.  Plaintiffs PHAROAH and KAREN upon information and belief that to comply with the EPA LCCR, they would at a minimum be required to construct and connect a seepage pit to the cesspool (at a cost exceeding $20,000), or remove the kitchenette from the ohana on the Subject Property, which would, in addition to the cost for such removal, reduce the value of the Subject Property by at least $40,000.

65.  On or about September 2010, Plaintiffs PHAROAH and KAREN in preparation for filing for bankruptcy, stopped making payments on the First Mortgage and Second Mortgage.

66.  On or about January 30, 2011, Plaintiffs PHARAOH and KAREN received notice that the Subject Property would be put up for sale at a public auction on February 25, 2011. The foreclosing mortgagee was listed as GMAC-LLC, and not GMAC or MERS.  A copy of the Notice of Mortgagee's Intention to Foreclose Under Power of Sale is attached hereto as *Exhibit 5*, and incorporated herein by reference.

67.  Plaintiffs' counsel discovered that an Assignment of Mortgage, dated January 13, 2011, purportedly conveying the First Mortgage from MERS, as nominee for GMAC MORTGAGE CORPORATION, to GMAC MORTGAGE, LLC. Said document was recorded January 25, 2011, in the State of Hawaii Bureau of Conveyances as Document No. 2011-014691. It references the Plaintiff's First Mortgage (by Bureau of Conveyances document number), but does not reference the Tax Map Key Number and incorrectly references a street address of "7012 Hawaii Kai Drive 1007, Makawao, HI 96768." A copy of said Assignment is attached hereto as *Exhibit 6*, and incorporated herein by reference. Upon information and belief, Hawaii Kai Drive is located on the Island of Oahu.

68.  Should GMAC be allowed to proceed with foreclosure on the Subject Property, Plaintiffs PHAROAH and KAREN will be irreparably harmed, in that they will be unlawfully deprived of possession of their property for whatever period of time it takes for them to regain such possession.  Such loss of

possession, being one of the "sticks" in the bundle of rights attendant to the ownership of property, cannot be fully compensated with money, as all real property is unique.

CLAIM I
VIOLATIONS OF THE SHERMAN/CLAYTON ANTI-TRUST ACTS
(Against Defendants GMAC, MERS and DOES 1-6)

69. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

70. The anti-competitive behavior of the Defendants is demonstrated by the agreement to fixed policies dictated by MERS, as more fully described hereinabove.[8]

71. Plaintiffs PHAROAH and KAREN upon information and belief and on that basis allege that Defendant GMAC, along with six large private banking institutions operating within the United States sued as DOES 1-6 (collectively "the Big Six"), agreed, beginning in or about 1994, to a scheme by which they would and did set up a private system of recording interests in land in the United States, that would give them a competitive advantage over smaller banking institutions to transfer mortgage loans freely into securitized pools of like mortgages; this system became Defendant MERS.

72. Plaintiffs PHAROAH and KAREN are further informed and believe and on that basis allege that subsequent to the creation of MERS, the Big Six used their combined market power in the

financial industry to take control of the market for private securitization of mortgages, to the virtual exclusion of smaller banking institutions, such that virtually all privately securitized mortgage loans are in trust to or serviced by the Big Six.

73.   Plaintiffs PHAROAH and KAREN upon further information and belief and on that basis allege that subsequent to the creation of MERS, the Big Six were able to and did control the administration and servicing of virtually all private securitization of pooled mortgages and the capital they generated, such that other smaller banking institutions of the United States have been virtually "shut out" from private sources of capital for funding residential mortgage loans, unless they were willing to join into the MERS system, and sell the mortgages they originated into the mortgage pools set up and controlled by the Big Six, such that those institutions are denied the benefits of the interest generated by such mortgages and the income generated from servicing those mortgages.

74.   Plaintiffs PHAROAH and KAREN upon information and belief and on that basis allege that subsequent to the creation of MERS, smaller banking institutions in the United States have been forced out of the residential lending market, and instead were forced to engage in much more speculative forms of lending,

---

[8] See footnotes 5 and 6, Id.

such as construction and development loans to builders, and small to medium sized commercial and industrial real estate loans.

75. Plaintiffs PHAROAH and KAREN upon information and belief and on that basis allege that subsequent to the creation of MERS, the Big Six and MERS used their control over the residential mortgage market by inflating the market for residential properties in the United States and thereby increasing the proportionally-based fees that such larger loans would generate.

76. Such inflation manifested itself in a complete inversion of the order of mortgage loan creation and securitization. The Big Six's desire for more profit led to a system in which a security instrument would be created and marketed to investors prior to any loan being originated. The security would be tailored to consist of mortgages of certain specified sizes, features, and risk levels. It would be only after the security was sold to investors with "place holder" and "bogus" assets that the Big Six would send out "orders" for mortgage loans that met the criteria set forth in the security's prospectus.

77. The "orders" would then be transmitted to loan originators, whether they were units or subsidiaries the Big Six or independent brokers. The originators would be "encouraged"

to make loans of the type specified in the orders, since those loans were the ones most likely to be purchased and securitized.

78.  The originators would then be under pressure to make such loans to their customers, regardless of the customers' needs.  Given that the Big Six virtually controlled the market in loans, those originators would steer customers toward those loans, and either fail to mention or steer customers away from loans that might be otherwise more appropriate.

79.  Because larger loans generated larger fees, the originators would steer customers toward larger loans, whether or not such larger loans were within the customers' means. Under the traditional residential loan model in the United States, lenders had tremendous financial incentive to only issue loans that borrowers could afford, based upon an intensive review of the borrower's financial situation, employment history, and the physical characteristics of the property and neighborhood. The lender did not notify the borrowers that this business model had changed, which resulted in harm to the borrowers who were now "qualified" for loans they could not hope to afford on a long-term basis.

80.  In order to facilitate the granting of larger loans, the Big Six developed loan products that did not depend on proof of a borrower's income, but rather depended on the value of the real property secured by the loans.

81.   In order to justify the granting of larger loans, pressure was brought to bear upon property appraisers: those who would not "hit the number" (appraise a property at a value that the lender wanted to lend) would not be given further business.

82.   As the result of the acts described above, the Big Six were able to increase the size of loans they made, bought, and securitized, allowing them to take their gains and redeploy them into even larger securities, and in the process were able to inflate the prices of residential real property to a point where they were far beyond the means of the purchasers to whom they were readily giving loans, according to the lending standards they themselves had developed and used for decades.

83.   Plaintiffs PHAROAH and KAREN upon information and belief and on that basis allege that the Big Six knew that such a business that depended upon ever increasing real estate values was unsustainable, and purposely created and used MERS to serve as a "firewall" between themselves, the loan originators, and the borrowers they were routinely pulling into unsustainable debt.

84.   Plaintiffs PHAROAH and KAREN upon information and belief and on that basis allege that the Big Six also depended upon MERS to give them a quick and efficient way of rationalizing the interests they would need to secure interests in the real property, whether or not such rationalizations

reflected the true relationship between lender and borrower, once their scheme of inflating prices reached its natural and inevitable point of saturation, real estate prices began to fall, and borrowers fell into financial distress.

85.  Plaintiffs PHAROAH and KAREN upon information and belief, and on that basis allege that the Big Six also created securities generally known as credit default swaps (CDSs), in which they took positions against the mortgage securities they created, in effect betting against the very home loan borrowers they had sought to entice into loans on constantly appreciating residential real property, knowing that those borrowers would eventually be unable to meet those inflated obligations that the Big Six had endeavored to create.

86.  Plaintiffs PHAROAH and KAREN upon information and belief, and on that basis allege that Defendant GMAC, (a) knew of and acquiesced to the creation of MERS by the Big Six, and actively used MERS to facilitate the creation of its own mortgage loan securities; and (b) knew of the acts of the Big Six described above in inflating the mortgage market, and knowingly and willfully accepted the benefits of such an inflated market in the form of increased fees for servicing residential mortgage loans and residential mortgage securities.

87.  Plaintiffs PHAROAH and KAREN upon information and belief, and on that basis allege that Defendant GMAC agreed to

include MERS as mortgagee and "nominee" for the Mortgage as part of an agreement between Defendant GMAC as a "member" of MERS, MERS itself, and the Big Six, sued here as DOES 1-6, inclusive, to (a) protect and insulate Defendant GMAC from otherwise valid claims and defenses by mortgagors and borrowers by providing an intermediary in the transaction; (b) provide a conduit for the securitization, and exclusive access to the business of servicing securitized mortgage loans and DOE Defendants 1-6; and (c) eliminate competition in the real residential loan industry in that consumers are offered only loans that conform to the preset parameters of securitization pools, and cannot obtain loans that more closely fit their particular needs.

88.   Defendants' conduct, as described above violates the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2.

89.   As the result of the conduct of Defendants GMAC, MERS, and DOES 1-6 described above, Plaintiffs PHAROAH and KAREN have been damaged, in that they have been subject to the imposition of artificially high mortgage rates and fees for mortgage servicing, without any meaningful choice, and without any opportunity to bargain for more advantageous fees, such fees being added to any balance due to the mortgagee in the event of default, all inconsistent with a system of free and fair trade guaranteed to all persons, and the restraint of which is

prohibited by the Sherman and Clayton Anti-Trust Acts, 15 U.S.C.

§ 2 et seq.

90.   Section 4 of the Clayton Antitrust Act, codified

at 15 U.S.C. §15, provides as follows:

[A]ny person who shall be injured in their business or
property by reason of anything forbidden in the antitrust
laws may sue therefor in any district court of the United
States in the district in which the defendant resides or is
found or has an agent, without respect to the amount in
controversy, and shall recover threefold the damages by him
sustained, and the cost of suit, including a reasonable
attorney's fee.

Plaintiffs PHAROAH and KAREN allege they are such persons

injured in their property and are, therefore, entitled to bring

an action against Defendants for Defendants' actions complained

of above.

91.   As a direct and proximate result of the unlawful

conduct of Defendants  GMAC, MERS, DOES 1-6, and each of them,

in monopolizing or attempting to monopolize the mortgage lending

and servicing market, Plaintiffs PHAROAH and KAREN have suffered

pecuniary damages in an amount to be determined, and subject to

treble augmentation.

92.   Plaintiffs PHAROAH and KAREN have also been required

to retain legal counsel and, therefore, request that Defendants

be required to pay Plaintiffs' attorney fees and costs necessary

to pursue their legal and just claims, pursuant to 15 U.S.C.

§15.

CLAIM II
VIOLATIONS OF THE HAWAII ANTI-TRUST/ANTI-MONOPOLY ACTS
(Against Defendants GMAC, MERS and DOES 1-6)

93.   The allegations contained in the preceding paragraphs of this Counterclaim are incorporated herein by reference.

94.   Mortgage lending and servicing in Hawaii is an activity in or affecting interstate commerce under Section 2 of the Sherman Act, as the parties traffic in personal service to foreigners and rely on foreign goods for their businesses.

95.   The conduct of Defendants  GMAC, MERS and DOES 1-6, and each of them, as described more fully above, violates the Hawaii Monopolization Act, Hawaii Revised Statutes § 480-9.

96.   As a direct and proximate result of the unlawful conduct of Defendants GMAC, MERS and DOES 1-6, and each of them, in monopolizing or attempting to monopolize the mortgage lending and servicing market, Plaintiffs PHAROAH and KAREN have suffered pecuniary damages in an amount to be determined at trial.

97.   Plaintiffs PHAROAH and KAREN have also been required to retain legal counsel and, therefore, request that Defendants, GMAC, MERS and DOES 1-6, and each of them, be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to Hawaii Revised Statutes § 480-9.

CLAIM III
MISREPRESENTATION
(Against Defendant GMAC)

98.   The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

99.   As set forth above, on or about December 19, 2005, and March 15, 2006, Defendant GMAC made loans secured by the subject property to Plaintiffs PHAROAH and KAREN.

100. At the time it made those loans to Plaintiffs PHAROAH and KAREN, Defendant GMAC represented that Plaintiffs would be able to refinance the loans with Defendant GMAC when they had built equity and established a favorable payment history.

101. Plaintiffs PHAROAH and KAREN are informed and believe that GMAC was aware of the requirements of the EPA LCCR, on or before December 15, 2005.

102. Plaintiffs PHAROAH and KAREN are informed and believe that Defendant GMAC knew or should have known that the Subject Property was subject to, and not in compliance with the EPA LCCR when it made the loans to Plaintiffs secured by the Subject Property on December 19, 2005 and March 15, 2006.

103. At the aforementioned time it made those loans to Plaintiffs PHAROAH and KAREN, Defendant GMAC failed to disclose to Plaintiffs that it would arbitrarily rely upon the Subject Property's non-compliance with the EPA LCCR as a basis for its refusal to honor its commitment to refinance their loans.

104. Plaintiffs PHAROAH and KAREN are informed and believe that because of its participation in the scheme to control and stifle competition in the residential mortgage loan industry described above, Defendant GMAC knew or should have known that because the Subject Property was subject to, and not in compliance with the EPA LCCR, no other lender would be willing to extend loans on the Subject Property without expensive physical renovation when it made the loans to Plaintiffs secured by the Subject Property on December 19, 2005 and March 15, 2006.

105. At the aforementioned time it made those loans to Plaintiffs PHAROAH and KAREN, Defendant GMAC did not disclose to Plaintiffs that no other lender would be willing to extend loans on the Subject Property due to the Subject Property's non-compliance with the EPA LCCR, and as a result, Plaintiffs would be effectively "trapped" in the loans they had with Defendant GMAC.

106. Plaintiffs PHAROAH and KAREN relied upon the representations made to them by Defendant GMAC, and that those representations were a full and complete disclosure of Defendant's policies and practices with regard to making loans on the Subject Property.

107. Had Plaintiffs PHAROAH and KAREN known of Defendant GMAC's true intention to arbitrarily deny them the opportunity to refinance their loans based on the Subject Property's non-

compliance with the EPA LCCR, when such non-compliance was not an issue when they received their loans, Plaintiffs would not have entered into the loan transactions, the First Mortgage, the LOC, or the Second Mortgage.

108. As the result of Defendant GMAC's misrepresentation of material fact set forth above, Plaintiffs PHAROAH and KAREN are entitled to, and thus seek, rescission of the First Mortgage, Second Mortgage, and their associated loan transactions.

109. As a further direct and proximate result of Defendant GMAC's misrepresentations of material fact set forth above, Plaintiffs PHAROAH and KAREN have been damaged in an amount to be established at trial.

110. Defendant GMAC's acts, as set forth above, were intentional, made with the intent to harm Plaintiffs PHAROAH and KAREN, and conducted in conscious disregard of Plaintiffs' rights.  Such acts constitute malice, and warrant the award of exemplary damages in an amount to be established at trial.

## CLAIM IV
## UNFAIR AND DECEPTIVE ACTS OR PRACTICES
### (Against Defendant GMAC)

111. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

112. Plaintiffs PHAROAH and KAREN are "consumers" as that term is defined in HRS § 480-1.

113. The described acts and practices of making and servicing mortgage loans involved "trade or commerce" as that term is used in HRS § 480-2(a).

114. An unfair or deceptive act or practice (UDAP) in the conduct of any trade or commerce is unlawful pursuant to HRS § 480-2(a).

115. Certain deceptive trade practices are also unlawful pursuant to HRS §481A-3.

116. In connection with the subject loan, Defendant GMAC engaged in UDAPs that violate HRS § 480-2(a) and/or 481A-3, including but not limited to:

  a. Targeting financially unsophisticated and otherwise vulnerable consumers for inappropriate credit products;

  b. Failing to adequately disclose the true costs and risks of the subject loan and its/their inappropriateness for Plaintiff;

  c. Failing to disclose that lender approved the subject loan based on financial documents required by Defendants such as Plaintiffs' tax returns and pay stubs without regard to Plaintiffs ability to sustain the loan with any reasonable means test;

  d. Falsely representing or failing to fully and completely disclose the amounts Plaintiffs were required to pay;

  e. Making a defective mortgage loan or loans that resulted in little net economic benefit to Plaintiffs with the primary objective of generating fees;

    f.   Making a loan on a property that was not in compliance with the EPA LCCR, which it knew could not be refinanced; and

    g.   Failing to disclose that it knew that the Subject Property was not in compliance with the EPA LCCR, and that Plaintiffs would be unable to refinance their loans as Defendant GMAC had represented when Plaintiffs entered into the loan transactions.

117. Defendant GMAC's actions in connection with the subject loans constitute UDAPs in violation of HRS §§ 480-2(a), 481A-3, or both.

118. Defendant GMAC's conduct caused Plaintiffs PHAROAH and KAREN to suffer injury to their property, including without limitation wrongfully induced payment of money.

119. Defendant GMAC's above-described acts and practices offend established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers and were, therefore, unfair in violation of HRS § 480-2(a).

120. Defendant GMAC's above-described acts and practices involved material representations, omissions or practices that were likely to mislead consumers acting reasonably under the circumstances and were, therefore, deceptive in violation of HRS §§ 480-2(a), 481A-3 and 454M, or all of them.

121. Pursuant to HRS § 480-12, a contract or agreement in violation of HRS Chapter 480 is void and is not enforceable at

law or in equity.   Plaintiffs thus seek rescission of the loan contract.

122. In the alternative, as a direct and proximate result of one or more of the foregoing acts and/or omissions of Defendant GMAC, Plaintiffs have been damaged in an amount to be established at trial.

123. Plaintiffs PHAROAH and KAREN have also been required to retain legal counsel and, therefore, request that the Defendant be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to Hawaii Revised Statutes § 480-9.

CLAIM V
BREACH OF FIDUCIARY DUTY
(Against Defendants GMAC and MERS)

124. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

125. Defendant GMAC, by contracting to, and representing it would provide mortgage loan services and a loan to Plaintiff PHAROAH and KAREN which they understood was not only meant to be best suited to their needs given their income and expenses but also would allow them to satisfy their obligations without risk of losing their property, was a "fiduciary" in which Plaintiffs PHAROAH and KAREN reposed trust and confidence, especially given that they were not and are not an investment bankers, securities

dealers, mortgage lenders, mortgage brokers, or mortgage lenders.

126. Defendant MERS, in agreeing to serve as mortgagee in the Mortgage transaction, also was likewise a fiduciary, in whom Plaintiffs PHAROAH and KAREN placed similar trust and confidence as they did in Defendant GMAC.

127. Defendant GMAC breached its fiduciary duties to Plaintiffs PHAROAH and KAREN by fraudulently inducing Plaintiffs to enter into a mortgage transaction which was contrary to Plaintiffs' stated intentions and interests, and by making a false representation as to its interest in the Subject Property to benefit its own interests at Plaintiff PHAROAH and KAREN's expense.

128. Plaintiffs PHAROAH and KAREN upon information and belief, and on that basis allege that Defendant MERS was aware of Defendant GMAC's breaches of fiduciary duties described above, did nothing to prevent them, and has done nothing to correct them, such actions in themselves being a further breach of fiduciary duty owed to Plaintiffs.

129. Plaintiffs PHAROAH and KAREN upon information and belief, and on that basis allege that Defendant GMAC breached its fiduciary duties to Plaintiffs by taking positions in the highly leveraged futures or options market, such interests were

in direct opposition to Plaintiff PHAROAH and KAREN's interests and the general housing market as a whole.

130. As a direct and proximate result of Defendants GMAC and MERS' breaches of fiduciary duties, Plaintiffs PHAROAH and KAREN are entitled to rescission of the transaction, and damages in an amount to be established at trial.

131. Under the totality of the circumstances, the actions of Defendants GMAC and MERS were willful, wanton, intentional, and undertaken with the conscious disregard for the Plaintiffs' rights.  Such actions warrant an award of exemplary damages to both punish and make an example of Defendants as to other persons or entities with similar inclinations.

CLAIM VI
UNJUST ENRICHMENT
(Against Defendant GMAC)

132. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

133. Defendant GMAC had an implied contract and warranty with Plaintiffs PHAROAH and KAREN to ensure that they understood all fees, rates, payments and charges which would be paid to Defendant GMAC or its successors in interest, to obtain credit on Plaintiffs' behalf, to not charge any fees which are not related to the settlement of the loan, and to disclose to Plaintiffs that the loan products together would provide a 30-

year mortgage designed specifically with Plaintiffs  known

personal financial information required by Defendant GMAC.

134. Defendant GMAC, failed and refused, and continues to
fail and refuse to honor the warranties set forth above.

135. Defendant GMAC cannot, in good conscience and equity,
retain the benefits from their actions of charging a higher
interest rate, fees, rebates, kickbacks, profits and gains from
any resale of mortgages and notes using Plaintiff's identity,
credit score, income, appraisal and reputation without consent,
right, justification or excuse as part of an illegal enterprise
scheme.

136. Defendant GMAC has been unjustly enriched at the
expense of Plaintiffs PHAROAH and KAREN and maintenance of the
enrichment would be contrary to the rules and principles of
equity.  Plaintiffs PHAROAH and KAREN thus demand restitution
from Defendant GMAC in the form of actual damages to be proven
at the trial on this matter.

CLAIM VII
SLANDER OF TITLE
(Against Defendants GMAC, MERS and GMAC-LLC)

137. The allegations contained in the preceding paragraphs
of this Complaint are incorporated herein by reference.

138. Historically, a note and mortgage generally were
inseparable. Every time a loan secured by a mortgage was sold,
the assignee was required to record the assignment to protect

its security interest. The MERS system caused this traditional system to be radically altered. While the promissory notes may be transferred many times between multiple MERS members, the mortgage remains held by MERS as "mortgagee of record." The very operation of the MERS system results in the promissory note and mortgage being split. Plaintiffs submit that MERS is not a party to the Promissory Note underlying the First Mortgage and has no authority to take any action with respect to the Note.

139. On or about January 15, 2011 Defendant MERS caused to be recorded in the State of Hawaii Bureau of Conveyances a document called an "Assignment," which purports to transfer the First Mortgage from MERS, as nominee for GMAC, to GMAC-LLC. Said document was recorded January 25, 2011, as document number 2011-014691. No mention is made of the underlying Promissory Note or its purported transfer to any entity. Said Assignment further is flawed in identifying the street address as "7012 Hawaii Kai Drive, Makawao, HI 96768," when Hawaii Kai Drive is located on the Island of Oahu and not on the Island of Maui where the Subject Property is located at 609 Loulu Way in Makawao. The Assignment does not identify the tax map key number. In addition to these defects, Plaintiff submit that the First Mortgage, because it has become separated from the promissory note it secures, has become unenforceable.

140. Plaintiffs submit that the Mortgage does not grant
legal authority to MERS to MERS to assign a valid and
enforceable interest in the Subject Mortgage; therefore, the
MERS assignment is fraudulent and/or void.

141. Plaintiff further submit that because MERS does not
have legal authority to assign the Mortgage and/or Note that
GMAC-LLC is not a bona fide holder of a valid security interest
in the Property, and its Notice of Intent to Foreclose, dated
January 18, 2011, is void.

142. The recording of the Assignment by MERS, as nominee
for GMAC, and the recording of the Notice by GMAC-LLC directly
impairs the vendibility of the property on the open market in an
amount to be determined at trial.

143. The recording of the documents made it necessary for
Plaintiffs PHAROAH and KAREN to retain legal counsel and bring
this action to cancel the instrument, casting doubt on
Plaintiffs' title.  Therefore, Plaintiffs are entitled to
attorney's fees and costs incurred in cancelling the instrument.
The exact amount of such damages is not known to Plaintiffs at
this time, and Plaintiffs will move to amend this Complaint to
state such amount when the same becomes known.

144. The aforementioned record was motivated by fraud and
malice, in that Defendants GMAC and MERS knew or should have
known that the assignment was false, because MERS has no

authority to assign the First Mortgage.  Such action warrants an

award of exemplary damages in an amount to be determined at time

of trial.

CLAIM VIII
INJUNCTIVE RELIEF
(Against Defendant GMAC-LLC)

145. The allegations contained in the preceding paragraphs

of this Complaint are incorporated herein by reference.

146. Plaintiffs PHAROAH and KAREN upon information and

belief that Defendant GMAC-LLC intends to conduct a non-judicial

foreclosure sale of the Subject Property pursuant to a notice

served upon them on February 25, 2011.

147. Plaintiffs PHAROAH and KAREN have alleged facts that

demonstrate a likelihood that Plaintiffs will succeed on the

merits of their claims set forth in this Complaint.

148. Plaintiffs PHAROAH and KAREN further allege that

should Defendant GMAC-LLC follow through with its stated

intention to foreclose upon the Subject Property, that they will

suffer irreparable harm, including, but not limited to loss of

their rights to rescind the loan transaction, loss of the use of

the Subject Property, and loss of their right to exclude others

from entering, making use of, or removing things of value from

the Subject Property.

149. Plaintiffs PHAROAH and KAREN further allege that the

balance of hardships between Defendant GMAC-LLC and them falls

firmly and unequivocally in their favor, in that Plaintiffs depend on the Subject Property as their home, while Defendant GMAC-LLC is a large business organization with ample assets upon which to depend, and no interest in the Subject Property beyond selling it to a third party.

150. Plaintiffs PHAROAH and KAREN, therefore, seek an order from the Court enjoining Defendant GMAC-LLC from conducting the sale of the Subject Property pursuant to any alleged power of sale, pending the resolution of this action, whether by judgment of the Court or mutually agreed settlement made between all parties to this action.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs PHAROAH and KAREN demand Judgment against Defendants, as follows:

(a) For an order enjoining Defendant GMAC-LLC from foreclosing upon the Subject Property pursuant to any alleged power of sale, pending the resolution of this action, whether by judgment of the Court or mutually agreed settlement made between all of the parties to this action;

(b) For a judgment of rescission of the First and Second Mortgages, and the Line of Credit;

(c) For a judgment awarding statutory damages in such amounts as shall be established at the time of trial;

(d) For a judgment awarding treble damages according to proof;

(e) For a judgment awarding exemplary damages in such amounts as shall be proven at the time of trial;

(f)    For a judgment awarding reasonable attorney's fees according to proof;

(g)    For a judgment awarding compensatory damages in such amounts as shall be proven at time of trial;

(h)    For costs of suit incurred; and

(i)    For such other relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs PHAROAH and KAREN, and each of them, hereby demand trial by jury on all issues triable by right to a jury.

Dated February 23, 2011, at Wailuku, Hawaii.

IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY

/s/ JAMES H. FOSBINDER
_____
JAMES H. FOSBINDER
*Attorney for Plaintiffs*